STEPHEN A. HIGGINSON, Circuit Judge:
The University of Houston found two former students, Ryan McConnell and Natalie Plummer, to have violated the University’s sexual misconduct policy. After two unsuccessful administrative appeals, McConnell and Plummer were ultimately expelled. McConnell and Plummer then sued the University and two University officials, alleging that they were denied constitutional due process and were discriminated against in violation of Title IX. The district court granted summary judgment to the University and the individual defendants, holding that no due process violation occurred and that the individual defendants were entitled to qualified immunity. The district court dismissed the Title IX claims under Rule 12(b)(6). Finding no reversible error, we affirm.
I
McConnell and Plummer were students at the University of Houston in 2011. On the night of November 19, 2011, McConnell met, for the first time, “Female UH Student” at a bar in Houston. Both McConnell and Female UH Student became intoxicated. They were ejected from the bar for disruptive behavior and walked to McConnell’s nearby dorm room. There, they engaged in sexual activity, but neither can remember exactly what occurred.
Later that evening, McConnell’s girlfriend (now wife), Plummer, appeared at his dorm room and found McConnell and Female UH Student, both naked and unconscious on the floor. Plummer yelled expletives and took a photo of the two, which she posted on Facebook but removed sometime later. Plummer also made two brief videos. In one, the “Dorm Room Video,” a drowsy McConnell appears to fondle the unresponsive Female UH Student as she lies on the dorm room floor and Plum-mer crudely berates him. After McConnell stands up, Plummer focuses the camera on Female UH Student’s vagina and- yells several lewd statements, including “Fucking yeah, yeah. Fucking get it, get it. Fucking get that pussy, bitch!” Simultaneously, slapping sounds can be heard in the background. In the other, the “Elevator Video,” Plummer films Female UH Student, who is .still fully naked, lying on the dormitory’s communal hallway floor. Female UH Student stands up and walks toward Plummer, and Plummer leads the nude Female UH Student into an elevator and sends it to the lobby. Voices can be heard speaking throughout the video, but the precise statements are often unclear. Plummer later showed the videos to her friends and shared the videos and photo electronically.
Other students found Female UH Student lying naked in the elevator, and they contacted University police. A Sexual Assault Nurse examined Female UH Student and found injuries consistent with sexual assault. Police investigated the incident, but did not criminally charge McConnell or Plummer.
On February 12, 2012, Female UH Student submitted a complaint to the University alleging that she was a victim of sexual assault. Richard Baker, the Vice President of the University’s Office of Equal Opportunity Services (EOS), notified McConnell that EOS was investigating the incident. Thereafter, McConnell and Plummer met with Baker to discuss *771 the incident and provide their side of the story. At her meeting with Baker, Plum-mer presented the photo she took of McConnell and Female UH Student, as well as the Elevator Video. Plummer did not disclose the Dorm Room Video. Based on the evidence gathered, the University did not proceed with disciplinary actions at that time. More than a year and a half later, however, the University received a copy of the Dorm Room Video from the Harris County Sheriffs Office and then decided disciplinary proceedings were warranted.
The University provided both McConnell and Plummer with a formal, written declaration of the various allegations against them on September 30, 2013.[1] Each student retained counsel, who formally responded to the charges and accompanied McConnell and Plummer to meetings with Baker. McConnell reported that he remembered nothing after he and Female UH Student arrived at his dorm room but denied sexually assaulting her. Plummer insisted that her actions were motivated by anger at her boyfriend, not an attempt to encourage him to assault Female UH Student. She also asserted that Female UH Student, when awakened, was pressing to “sex” her.[2]
After completing his investigation, Baker authored a report finding that McConnell “violated the sexual assault and attempted sexual assault provisions ... when he engaged in sexual activity with [Female UH Student] on November 19, 2011, without her consent.”[3] Baker also found that Plummer “facilitated/encouraged the sexual assault of another [UH] student[,]” “electronically recorded the sexual activity of another [UH] student and then shared that video ... without that student’s permission[,]” and “made lewd, lecherous and humiliating comments of a sexual nature against another [UH] student.”
Pursuant to the University’s procedures, each student appealed Baker’s findings to a four-person panel of University personnel. The panels, tasked with upholding or rejecting EOS’s findings based on a preponderance of the evidence standard, held separate appeal hearings for McConnell and Plummer. Neither student attended the other’s full hearing, although Plummer testified as a witness at McConnell’s hearing. Baker, an attorney, presented his findings to the panel, including by testifying about his investigation and providing a packet of investigatory materials. He called two witnesses at McConnell’s hearing—two University police officers who responded to and investigated the incident— and none at Plummer’s hearing. An additional University EOS attorney was present at each hearing to advise the panel.
McConnell’s and Plummer’s attorneys attended and participated in the hearings. Although the University’s procedures explicitly allow a student’s attorney only a minor role as an “adviser” at the appeal *772 hearing, in this case, the University allowed McConnell’s and Plummer’s attorneys to participate more fully, including at times by examining and cross-examining witnesses and making statements to the panel. Additionally, McConnell’s and Plum-mer’s attorneys drafted and submitted formal responses to the University’s allegations and met with University officials on several occasions to discuss the evidence against the plaintiffs.
McConnell and Plummer each made opening and closing arguments, testified, presented witnesses, cross-examined witnesses, and raised legal and factual objections to the panel. The University’s procedures explicitly allow cross-examination of witnesses only through the submission of written questions. Here, however, the panels frequently allowed all parties (or then-attorneys) to question witnesses (including Baker) in person at the hearing. McConnell and Plummer were informed of the investigatory evidence several days before each hearing, although some identities were redacted from materials based on educational privacy concerns. At each hearing, the panel was shown the Dorm Room and Elevator Videos, and all parties offered interpretations of the videos’ contents. Female UH Student was not deposed and did not appear or testify at either hearing. Neither Baker nor any other witness testified to the substance of any conversations with Female UH Student about her memory of the night, and Female UH Student’s original complaint— which was among the materials supplied to the panels—stated that she did not remember anything that occurred after she arrived at the bar the night of the incident.
Both hearing panels upheld Baker’s findings. McConnell and Plummer then appealed to Richard Walker, the University’s Vice President and Vice Chancellor for Student Affairs and Enrollment Services, as allowed by the University’s procedures. In September 2014, Walker denied these further appeals. McConnell and Plummer were expelled and banned from the University and any activities connected with it.[4] The disciplinary notations were, however, removed from their official transcripts.
■In this lawsuit challenging their discipline, McConnell and Plummer complain that the University retroactively applied its 2013 Misconduct Policy to their 2011 conduct. They also assert that the University’s hearing procedures failed to give them adequate notice of the adverse evidence, denied them confrontation rights against Female UH Student, and limited cross-examination to written questions. Finally, they charge that Baker’s multiple roles created impermissible conflicts. These deficiencies, they allege, deprived them of constitutional due process.[5]
The district court, in a 36-page opinion relying on Supreme Court and Fifth Circuit law, concluded that the process offered to McConnell and Plummer was constitutionally sufficient. Plummer v. Univ. of Hous., No. 4:14-CV-2959, 2015 WL 12734039 (S.D. Tex. May 28, 2015). McConnell and Plummer appealed. We affirm.
II
“It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion.” Wood v. Strickland, 420 U.S. 308, 326, 95 S.Ct. 992, *773 43 L.Ed.2d 214 (1975); see also Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 648, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (“[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators.”). “A university is not a court of law, and it is neither practical nor desirable it be one.” Flaim v. Med. Coll. of Ohio, 418 F.3d 629, 635 n.1 (6th Cir. 2005) (citation omitted). Ultimately, courts must focus on “ensuring the presence of ‘fundamentally fair procedures to determine whether the misconduct has occurred.’ ” Id. at 634 (quoting Goss v. Lopez, 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)).
Generally, the amount of process due in university disciplinary proceedings is based on a sliding scale that considers three factors: (a) the student’s interests that will be affected; (b) the risk of an erroneous deprivation of such interests through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (c) the university’s interests, including the burden that additional procedures would entail. See Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In Goss v. Lopez, the Supreme Court held that an informal give-and-take between a high school student and the administration afforded sufficient process preceding a temporary suspension. 419 U.S. at 584, 95 5.Ct. 729. The Court specified, however, that “[ljonger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures.” Id. This court has held that “due process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct.” Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 158 (5th Cir. 1961). “[T]he interpretation and application of the Due Process Clause are intensely practical matters and ... ‘the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.’” Goss, 419 U.S. at 578, 95 S.Ct. 729 (alteration omitted) (quoting Cafeteria Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)). “The nature of the hearing should vary depending upon the circumstances of the particular case.” Dixon, 294 F.2d at 158.
Here, the first and third Mathews factors are easily identified. On the one hand, McConnell and Plummer have a liberty interest in their higher education. See Univ. of Tex. Med. Sch. at Hous. v. Than, 901 S.W.2d 926, 929-30 (Tex. 1995) (recognizing a liberty interest in graduate higher education under the Texas Constitution); accord Dixon, 294 F.2d at 157 (“The precise nature of the private interest involved in this case is the right to remain at a public institution of higher learning in which the plaintiffs were students in good standing.”).[6] The sanctions imposed by the University could have a “substantial lasting impact on appellants’ personal lives, educational and employment opportunities, and reputations in the community.” Doe v. Cummins, 662 Fed.Appx. 437, 446 (6th Cir. 2016) (unpublished) (citing Goss, 419 U.S. at 574-75, 95 S.Ct. 729). On the other hand, the University has a strong interest in the “educational process,” including maintaining a safe learning environment for all its students, while preserving its limited administrative resources. See Goss, 419 U.S. at 580, 583, 95 S.Ct. 729; see also Gorman v. Univ. of Rhode Island, 837 F.2d 7, 14-15 (1st Cir. 1988) (“Although the protection of [a student’s private interest] would require all possible safeguards, *774 it must be balanced against the need to promote and protect the primary function of institutions that exist to provide education.”)-[7]
Applying the second Mathews factor— the risk of erroneously depriving McConnell and Plummer’s interests through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards—the unique facts of this case render it unnecessary that we draw any determinative line regarding sufficient procedures in state university disciplinary cases. McConnell and Plummer received multiple, meaningful opportunities to challenge the University’s allegations, evidence, and findings. In light of the graphic conduct depicted in the videos and photo— which the panels viewed for themselves before affirming the University’s findings—further procedural safeguards would not have lessened the risk of an erroneous deprivation of McConnell and Plummer’s interests or otherwise altered the outcome. See Mathews, 424 U.S. at 335, 96 S.Ct. 893; see also Flaim, 418 F.3d at 639-43 (hold-mg that additional procedures were not necessary in case without significant factual disputes); Cummins, 662 Fed.Appx. at 446-451 (finding students accused of sexual assault received adequate due process in university disciplinary hearings where, “although the procedures employed by [the university] did not rise to the level of those provided to criminal defendants,” students received an “opportunity to be heard at a meaningful time and in an meaningful manner” (quoting Mathews, 424 U.S. at 333, 96 S.Ct. 893)); cf. Dailey v. Vought Aircraft Co., 141 F.3d 224, 230 (5th Cir. 1998) (“There may be cases of such gross and outrageous conduct in open court as to justify very summary proceedings for an attorney’s suspension or removal from office, but even then he should be heard before he is condemned.” (internal quotation omitted)); Scott v. Harris, 550 U.S. 372, 380-81, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (recognizing that the existence of undisputed video evidence, which discredited the plaintiffs version of events, justified summary judgment).[8] Thus, we *775 hold that McConnell and Plummer did not meet their summary judgment burden to demonstrate a genuine factual dispute that the process surrounding their disciplinary cases was constitutionally defective.
McConnell and Plummer argue several potential violations of due process standards. They assert inadequate notice of the standards of conduct because the University’s sexual harassment/misconduct policy was changed between 2011, when the incident occurred, and 2013, when they were formally accused. They contend the investigation against them was not full and fair, that Baker’s role was suffused with conflicts and bias against them, that there was an “absence of direct evidence,” and that they were denied confrontation of the victim and effective cross-examination. Each of these claims will be briefly discussed.
The claim that a standard of misconduct was retroactively imposed on McConnell and Plummer is unsupportable on the facts of this case. Their conduct, as detailed in the photo and two videos, violated the University’s Interim Sexual Assault Policy (effective in November 2011), which prohibited sexual assault as “the touching of an unwilling person’s intimate parts ... through the use of the victim’s mental or physical helplessness of which the accused was aware or should have been aware.” The policy also prohibited “... sexual misconduct which is lewd, ex-hibitionistic or voyeuristic ... [and] forbids ... any act which demeans, degrades, or disgraces any person.... ” The University’s Interim Sexual Harassment policy (effective in November 2011) prohibited “the use of sexually oriented photos ... unrelated to instruction and/or the pursuit of knowledge.”[9] The conduct captured in the videos and photo also violated the more broadly worded 2013 Sexual Misconduct Policy, which encompassed the following violations: (facilitating) sexual assault; taking abusive sexual advantage of another; and non-consensual electronic recording and transmitting sexual images without the knowledge and consent of the parties involved. As applied to this conduct, the charged violations are neither vague nor outside the legitimate purview of the policies.
McConnell and Plummer also assert that they were denied confrontation of Female UH Student and the opportunity to effectively cross-examine adverse witnesses. This case does not require that we determine whether confrontation and cross-examination would ever be constitutionally required in student disciplinary proceedings. The unique facts of this case demonstrate no procedural deficiency in this regard. The University’s case did not rely on testimonial evidence from Female UH Student. Indeed, it is undisputed that Female UH Student remembered little about the incident, and no one testified to the substance of any conversations with her about her memory of the night. Rather, the primary evidence Baker presented to the panels were the videos and photo, taken and distributed by Plummer. The conduct depicted in the videos and photo— combined with Plummer’s subsequent distribution and publication—was sufficient to sustain the University’s findings and sanctions. See Mathews, 424 U.S. at 335, 96 S.Ct. 893 (courts must weigh whether further procedural safeguards would have lessened the risk of an erroneous depriva *776 tion or otherwise altered the outcome). We emphasize that McConnell and Plummer do not argue that Female UH Student’s testimony or cross-examination would have suggested that she consented to the degrading and humiliating depictions of her in the videos and photo, nor that such testimony could have otherwise altered the impact of the videos and photo.[10] See Flaim, 418 F.3d at 641 (citing Winnick v. Manning, 460 F.2d 645, 549 (2d. Cir. 1972)) (concluding that cross-examination of arresting officer was not essential to due process in medical student’s disciplinary hearing when the case did not turn on credibility of testimony and plaintiff was unable to identify any significant benefits that cross-examination would have provided). Further, because McConnell and Plummer do not challenge the authenticity of the videos and photo, it does not makes sense to criticize an “absence of direct evidence.”
McConnell and Plummer’s claims that the University failed to provide adequate notice of adverse evidence and that Baker’s multiple roles suffused the proceedings with bias are similarly unpersuasive. Applying the second Mathews factor, even if the University could have provided notice further in advance- of the hearings of the identities of relevant witnesses and other evidence, the ultimate disciplinary decisions were conclusively supported by the videos and photo, about which McConnell and Plummer had full knowledge. See Mathews, 424 U.S. at 335, 96 S.Ct. 893. McConnell and Plummer do not show how more timely knowledge of the adverse evidence could have aided in their defense. See id. Likewise, McConnell and Plummer have not demonstrated that Baker’s dual roles amount to a constitutional violation. They argue that Baker’s dual role as victim advocate and investigator prevented him from impartially investigating the incident, and that EOS’s role in advising the panel created a conflict of interest.[11] But McConnell and Plummer fail to show how any of these alleged impermissible conflicts undermined the integrity of their proceedings. Baker relied primarily on the videos and photo to support his findings before the panel, and there is nothing in the record or offered by McConnell and Plummer to suggest that a different investigator would have uncovered information diminishing the significance of that graphic evidence to the initial findings. See Mathews, 424 U.S. at 335, 96 S.Ct. 893; cf. Baran v. Port of Beaumont Nav. Dist. of Jefferson Cty., 57 F.3d 436, 446 (5th Cir. 1995) (“[Where alllegations of bias based on the prejudgment of the facts or outcome of a dispute generally stem from the fact that an administrative body or hearing officer has dual roles of investigating and adjudicating disputes and complaints ... the honesty and integrity of those serving as adjudicators is presumed.” (citing Withrow v. Larkin, 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975))). Notably, the *777 separate EOS attorney advisor explicitly instructed the panels that they were free to disagree with the interpretations of the evidence offered by the parties, including Baker.
We have carefully reviewed the record, and we hold that the process Appellants received was sufficient. It follows that the question of qualified immunity for the individual defendants becomes moot. Again, we emphasize that we do not suggest a constitutional “floor” for state university disciplinary procedures. Whether a state university has provided an individual student sufficient process is a fact-intensive inquiry and the procedures required to satisfy due process will necessarily vary depending on the particular circumstances of each case. See Dixon, 294 F.2d at 158. As we noted at the outset, the Supreme Court has admonished that “[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion.” Wood, 420 U.S. at 326, 95 S.Ct. 992; see also Davis, 526 U.S. at 648, 119 S.Ct. 1661 (“[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators.”).
hi
We now turn to McConnell and Plum-mer’s argument that the district court erred in dismissing their Title IX claims. The district court carefully articulated the principles governing dismissals under Fed. R. Civ. Pro. 12(b)(6) for failure to state a claim and for McConnell and Plummer’s claims that the University and individual defendants should be liable for sex discrimination against them under Title IX. 20 U.S.C. § 1681(a). We find no error in the district court’s dismissal.
We review the dismissal and the district court’s related conclusions of law de novo. Dehoyos v. Allstate Corp., 345 F.3d 290, 294 (5th Cir. 2003). Briefly, McConnell and Plummer were required to plead facts asserting a plausible claim' for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678-79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The University, as a recipient of federal funding, can be held liable for intentional discrimination on the basis of sex or for deliberate indifference to discrimination against or harassment of a student on the basis of sex. Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005).[12]
According to the Second Circuit, a university can face Title IX liability for imposing discipline where gender is a motivating factor for the decision under two general theories. Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994). In the first instance, the claim is that the charged student (plaintiff) was innocent and wrongly found to have committed an offense. Id. The second instance alleges selective enforcement, i.e., that regardless of the student’s culpability, the severity of the penalty and/or the university’s decision to initiate proceedings was affected by the charged student’s gender. Id. More recently, the same court held a student’s case sufficient to proceed under Title IX where a male student alleged himself innocent of engaging in nonconsensual sex with a female student. Doe v. Columbia Univ., 831 F.3d 46, 50, 53, 59 (2d Cir. 2016). He further alleged procedural bias and improprieties in the university’s discipline process. Id. at 56-59. He also alleged that he was singled out because Columbia University was in the midst of a public campaign criticizing its alleged weak re *778 sponse to female students’ complaints of sexual assaults by males. Id. at 50-51, 53, 57-58. McConnell and Plummer and the University each rely on the theories adopted in Yusuf, so we need not speculate on any other possible theories of Title IX liability.
McConnell and Plummer’s allegations here rest on selective enforcement and deliberate indifference to their rights. With regard to selective enforcement, they urge that the University was motivated by gender bias in favor of Female UH Student. They assert essentially that McConnell and Female UH Student were in pari delicto, in that both had passed out and each engaged in sexual conduct with another extremely intoxicated individual. Plummer chides the University for not taking up her charge of misconduct against Female UH Student for pressing to “sex” her. We agree, however, with the district court’s assessment of the undisputed facts: the photo and graphic videos, taken and later exhibited by Plummer, show McConnell touching Female UH Student in private areas. Female UH Student is unresponsive and inactive. Female UH Student was found naked in an elevator and taken to the hospital for sexual assault testing. The University’s discipline was predicated on what the two charged students did, and during the discipline process they—a male and a female—were treated equally. There is no sound basis for an inference of gender bias.[13]
McConnell and Plummer tersely assert that the University was deliberately indifferent to the constitutional insufficiency of the procedures it employed in sexual misconduct discipline cases. Although the University may have been better advised in a number of procedural respects, there is a stark contrast between McConnell’s and Plummer’s culpability and case procedures applied to them and the allegations of student innocence and official refusal to conduct a thorough investigation in Columbia Univ., 831 F.3d at 49-50, 52-53, 56-57. Deliberate indifference to constitutional rights is a very high standard of misconduct. See Sanches v. Carrollton-Farmers Branch Ind. Sch. Dist., 647 F.3d 156, 169-70 (5th Cir. 2011). As the district court held, the pleadings here do not meet that standard.
IV
For the foregoing reasons, the judgment of the district court is AFFIRMED.

. At some point, Female UH Student decided not to pursue her complaint, and thus the University was the “Complainant” in both proceedings as provided for by the University’s procedures.

. The dissent observes that Female UH Student "was never investigated for her lascivious advances toward Plummer.” Plummer never submitted a formal complaint to EOS, which would have required EOS to initiate investigative processes.

."Sexual activity” as defined by the University’s 2013 Sexual Misconduct Policy includes "any intentional contact with the breasts, buttock, groin, or genitals, or touching another with any of these body parts, or making another touch the Complainant or themselves with or any of these body parts; and any intentional bodily contact in a sexual manner, though not involving contact with/ofiby breasts, buttocks, groin, genitals, mouth or other orifice.”

. McConnell graduated from the University before his sanction was imposed.

. The dissent criticizes the University’s use of a "preponderance of the evidence” standard for the panels’ review of Baker's initial findings. McConnell and Plummer, however, do not challenge this aspect of their proceedings on appeal.

. Texas has not recognized a property interest in graduate higher education. Than, 901 S.W.2d at 930 n.1.

. The dissent narrowly characterizes the University's interest as "impartially adjudicating quasi-criminal sexual misconduct allegations.” Although it is true that the University is interested in providing a fair disciplinary process, the Supreme Court has emphasized that "[a] school is an academic institution, not a courtroom or administrative hearing room.” Bd. of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78, 88, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978); see also Goss, 419 U.S. at 580, 583, 95 S.Ct. 729 (“[F]urther formalizing the suspension process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process.”); Gorman, 837 F.2d at 15 ("[I]t is no exaggeration to state that the undue judicialization of an administrative hearing, particularly in an academic environment, may result in an improper allocation of resources, and prove counter-productive.”).

. The dissent criticizes our reliance on Flaim and Cummins. Flaim supports our decision not because it involved identical circumstances (it did not), but because it demonstrates that the amount of process constitutionally required in state university disciplinary proceedings will vary in accordance with the particular facts of each case. See 418 F.3d at 643 & n.8 ("It is because of the unique facts of this case that we find the procedures used by Medical College of Ohio adequate.”). Cummins, which we observe for its persuasive analysis, arguably is distinguishable by a feature that would suggest more process was due those students than McConnell and Plummer: the sexual assault victims in Cummins testified at the accused students' hearings and the students were allowed limited cross-examination only by submitting written questions to the panel. 662 Fed.Appx. at 439-442 (one of the accused students was precluded from cross-examining his accuser entirely). In rejecting the students’ challenge to this alleged procedural flaw, the Cummins court explained that "[a]ny marginal benefit that would accrue to the fact-finding process by allowing *775 follow-up questions in appellants’ ... hearings is vastly outweighed by the burden on [the university].” Id. at 448.

. Plummer’s posting of the photo to Facebook and sharing the videos with her friends would constitute sexual harassment under the 2011 policy, as would her on-video remarks about Female UH Student.

. Plummer contends that Female UH Student sexually harassed her by repeatedly asking to "sex her.” This disputed allegation, if true, would at best demonstrate independent misconduct, not a defense to Plummer’s own actions.

. At the hearings, Baker offered interpretations of the graphic evidence, as well as legal argument about how the University’s Sexual Misconduct Policy should be interpreted and applied to that evidence. McConnell and Plummer (on their own and through their attorneys) argued their own interpretations of the video and photo evidence and often vigorously contested the analysis offered by Baker. At both hearings, the separate EOS attorney serving as panel adviser counseled the panel members that' they were free to interpret the video and photo evidence themselves and draw their own conclusions about the import of that evidence. This separate EOS attorney adviser also responded to panel questions regarding the meaning and application of the University’s Sexual Misconduct Policy.

. Liability under Title IX does not extend to school officials, teachers and other individuals. Davis, 526 U.S. at 640-43, 119 S.Ct. 1661. Hence, McConnell and Plummer do not appeal the dismissal of the University administrators.

. McConnell and Plummer assert that the district court should not have awarded the University "summary judgment” based on the University’s list of 39 sexual harassment investigations conducted from 2010 forward, which revealed that nearly all involved male accused students and only 3 involved male accusers. The district court did not address this list, and we need not do so except to note that the same list shows that at least 41% of the investigations resulted in EOS making "no finding” against the accused.