# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 21, 2023

Lyle W. Cayce
Clerk

———————

No. 22-30588

———————

Andrew Babinski,

*Plaintiff—Appellee*,

*versus*

Kristin Sosnowsky, *in her personal and official capacities as Chair of the School of Theatre of Louisiana State University*; Shannon Walsh; John Fletcher; Alan Sikes,

*Defendants—Appellants*.

———————————————————————

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:20-CV-426

———————————————————————

Before Richman, *Chief Judge*, and Stewart and Dennis, *Circuit Judges*.

Carl E. Stewart, *Circuit Judge*:

Kristin Sosnowsky, Shannon Walsh, John Fletcher, and Alan Sikes (collectively "the Professors") appeal the district court's denial of qualified immunity after Andrew Babinski alleged that they violated his Fourteenth Amendment right to due process by conspiring to prevent his continued enrollment in Louisiana State University's ("LSU") theatre program. Because the Professors' conduct does not violate clearly established law, we

No. 22-30588

REVERSE the district court's determination that they were not entitled to qualified immunity and DISMISS Babinski's claims.

## I. Background

### A. *Babinski's Time at LSU*

Babinski enrolled in LSU's theatre doctoral program in 2017, where he excelled in his coursework. His academic accomplishments garnered him favor within the program, and he was invited to teach undergraduate students and serve as a teaching assistant to Professor Fletcher. But his experience took a turn for the worse in the Spring 2019 term when he enrolled in Professor Walsh's THTR 7923 course, "Gender, Sexuality, and Performance." According to Babinski, he thought he signed up for a semester of critical discussions on gender and sexuality in performance but was disappointed to find out that the class was largely skewed to Walsh's politically-progressive opinions.

Throughout the semester, Babinski alleges that he suffered hostility and mistreatment from his classmates and Walsh in THTR 7923. He states that his classmates regularly made fun of his opinions and were dismissive of his views because they often differed from his peers' assessments of the same issues. He further claims that his mistreatment in the course only worsened when he approached Walsh for help. He remained in the class despite his perceived mistreatment because the course was necessary to progress in the program.

Walsh required each student to write a term paper relevant to the subject matter of the course to receive a passing grade in her class. Babinski wrote his paper in a performative fashion, a writing technique he learned at

2

No. 22-30588

LSU.[1] His paper criticized the Professors, the LSU theatre program more generally, and his classmates in THTR 7923. Walsh was not amused. In fact, she assigned him a failing grade for the course and immediately forwarded his paper to Professor Sosnowsky, the Chair of LSU's School of Theatre, for additional review.

Sosnowsky read Babinski's paper and was so troubled by its contents that she submitted it to the LSU Police Department ("LSU Police") and the LSU Office of Student Advocacy and Accountability ("SAA"). The LSU Police found no actionable security issues or threats in Babinski's paper. SAA came to the same conclusion and refused the Professors' request for a "no contact directive" issued against him. Having exhausted all administrative avenues to no avail, Babinski alleges that the Professors took matters into their own hands and conspired to prevent him from continuing in the theatre program.

Babinski avers that the Professors sabotaged his efforts to appeal his failing grade in THTR 7923. Specifically, he alleges that they intentionally refused to follow LSU's regulations for student grade appeals. For example, the university required the Professors to have an initial discussion with Babinski and find an amenable solution—he states that this never occurred because they refused to meet or even correspond with him. Additionally, he asserts that, under LSU's grade-appeal regulations, he was entitled to "a meeting with the department chair . . . and [relevant] professor within 14 days" of his appeal. Babinski states that this meeting never occurred either

---

[1] Babinski explains that "performative writing" is "a purposefully exaggerated style whereby the writer is performing a concept or idea through language, manner and form, in addition to its content." While Babinski has not produced the paper in these proceedings, he has conceded that it contained "strong language, expletives, and harsh criticisms of various faculty members and peers[.]" He also included a disclaimer that his paper was "performative and exaggerated" when turning it in to Walsh.

3

No. 22-30588

and that Sosnowsky "instead solicited a single e-mailed statement from [him] and [Walsh], from which she e-mailed them her ruling." He maintains that his appeal was only denied due to the Professors' unfiltered bias and efforts against him.

Babinski states that his failed appeal process was only the beginning of his problems. Losing his appeal meant keeping his failing grade, which placed him on academic probation, and forfeited his graduate-assistantship stipend. He claims that the Professors routinely made direct petitions to the graduate school to obtain a waiver for continued funding if a student lost funding due to an academic misstep. But that they took no such measures for him as part of their scheme to force his withdrawal from the program.

Babinski also claims that the Professors held a secret disciplinary meeting after his grade appeal but before he returned for the Fall 2019 semester. At this meeting, which he was allegedly prohibited from attending, he avers that the Professors determined that they would do whatever was necessary to prohibit him from continuing in the theatre program.[2] This included the Professors' refusals to: (1) teach him in any additional courses, especially required courses like THTR 7923; (2) convene a dissertation panel for him; and (3) administer his general examinations. He states that each of these actions were independently sufficient to ensure that he was unable to continue in or complete the theatre program.

The Professors' alleged campaign against Babinski culminated in the Dean advising him that there was no way for him to progress in the Ph.D. program because none of the Professors wanted to teach him or serve on a dissertation committee for him. Babinski states that the Dean explained to

_____

[2] Babinski explains that he was only permitted to provide a statement to be read and summarized by one of the Professors at the meeting.

him that the Professors expected his withdrawal from the theatre program as soon as possible.

Babinski alleges, however, that LSU's regulations provided him with an alternative route to convene a dissertation committee that did not include any of the Professors. He claims that the Dean and the Professors intentionally withheld this information from him to ensure his departure from the program. In support, he highlights that the Professors permitted a similar arrangement for a different student in the same program as him. Additionally, he asserts that LSU's regulations permitted him to obtain credit for his remaining required course, THTR 7923, through independent study. He states that this is another option that the Professors knew was available yet refused to inform him of in an ongoing effort to mislead him into believing that he had no options to continue in the theatre program.

Babinski took a full courseload in the Fall 2019 term, consisting of one unrequired theatre course and three classes that he needed for his minor concentration. During this semester, he also claims to have made multiple attempts at remedying his issues with the Professors. He states that these efforts were all fruitless as they refused to change their stance on his progression in the theatre program. He ultimately cut his losses and withdrew, instead pursuing and obtaining a second master's degree in the philosophy department. He sued the Professors in federal court.

### B.    *District Court Proceedings*

At the district court, Babinski advanced numerous constitutional claims against the Professors, each deriving from his assertion that they violated his right to procedural due process by conspiring and accomplishing a de facto expulsion. The Professors moved to dismiss his claims on qualified immunity grounds. The district court partially held in their favor, granting them qualified immunity on all of Babinski's claims except his: (1) property-

No. 22-30588

interest procedural due process claim and (2) liberty-interest procedural due process claim against Sosnowsky.

On Babinski's property-interest due process claim, the district court reasoned that none of the Professors were entitled to qualified immunity because he sufficiently alleged that they effected a de facto expulsion without affording him a meaningful opportunity to state his case for remaining in the program. It relied on his argument that the Professors willfully circumvented LSU's policies to deprive him of any process. Furthermore, citing *Goss v. Lopez*, 419 U.S. 565 (1975) and *Plummer v. Univ. of Hous.*, 860 F.3d 767, 773 (5th Cir. 2017), *as revised* (June 26, 2017), it held that he cited caselaw clearly establishing that the Professors' conduct violated his due process rights as an LSU student.

Regarding Babinski's substantive due process claim against Sosnowsky, the district court proceeded under the stigma-plus doctrine.[3] It held in his favor because he alleged that Sosnowsky made false claims about him to harm his reputation and withheld mitigating information from LSU Police, SAA, and other university representatives. It stated that Sosnowsky's actions violated Babinski's liberty interest in his reputation, good name, and integrity.

In sum, the district court concluded that the Professors "knew or should have known that it would be unconstitutional for them to force Babinski out of the Program without sufficient process, so qualified immunity

---

[3] The stigma-plus doctrine recognizes the liberty interest that an individual has in his good name and reputation. To make out a stigma-plus claim, a plaintiff must demonstrate that: (1) he has suffered a stigma from some government action; plus (2) he experienced the extinguishment of a right of status previously recognized by state law. *San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697, 701 (5th Cir. 1991).

is inappropriate as to the procedural due process claims." The Professors timely appealed.

## II.     Standard of Review

We review a district court's denial of a motion to dismiss asserting qualified immunity de novo, accepting all well-pleaded facts as true and viewing them in the light most favorable to the plaintiff. *See Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008). A plaintiff attempting to overcome qualified immunity at the Rule 12(b)(6) stage must plead facts that allow this court to reasonably infer that the defendant is liable for the harm alleged. *See Arnold v. Williams*, 979 F.3d 262, 267 (5th Cir. 2020).

## III.     Discussion

"To be entitled to the procedural protections of the Fourteenth Amendment," Babinski must show that he was "deprived [] of either a 'liberty' or a 'property' interest." *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 82 (1978). If there is a liberty or property interest at stake and due process applies, "the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

As an initial matter, we note that, although the district court determined that there was a liberty and property interest at stake, the Professors do not challenge this holding. Accordingly, the issue is forfeited on appeal. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party forfeits an argument . . . by failing to adequately brief the argument on appeal.").

The Professors do challenge the district court's determination that Babinski received inadequate process. They argue that the district court: (1) incorrectly held that they violated Babinski's due process rights; and (2) erroneously relied on the Supreme Court's decision in *Goss* and this court's

decision in *Plummer* to hold that they were on notice that their alleged campaign against Babinski's continued enrollment in LSU's theatre program violated his constitutional right to due process. *See* 419 U.S. at 465; 860 F.3d at 767. Specifically, they contend that the district court ignored that Babinski received the only process he asked for and that it analyzed the clearly established prong of the qualified immunity analysis at too high a level of generality. On the latter point, they maintain that *Goss* and *Plummer* are too dissimilar from the instant case to have provided the Professors sufficient notice of their allegedly unconstitutional behavior. We agree with the Professors' latter argument and reverse in their favor.

"Qualified immunity operates to ensure that before they are subjected to suit, [public officials] are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation and citation omitted). "When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." *Ramirez v. Guadarrama*, 3 F.4th 129, 133 (5th Cir. 2021) (quotation and citation omitted). This demonstration requires a plaintiff to allege both "(1) the violation of a federal constitutional or statutory right; and (2) that the right was clearly established at the time." *Id.* (citation omitted). These inquiries may be addressed in "whatever order [this court] deems most expeditious." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotations and citation omitted). The Supreme Court has cautioned appellate courts on "defin[ing] clearly established law at too high a level of generality." *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021). "Although we do not require a case *directly* on point . . . there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct

No. 22-30588

is definitively unlawful." *Walsh v. Hodge*, 975 F.3d 475, 485–86 (5th Cir. 2020) (internal quotations and citation omitted) (emphasis in original); *see also Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.").

### A.    *Constitutional Violation*

To defeat the Professors' qualified immunity defense, Babinski had to assert a "violation of a federal constitutional or statutory right[.]" *Ramirez*, 3 F.4th at 133. At the district court, he argued that the Professors violated his constitutional right to procedural due process by failing to offer him notice and an opportunity to be heard before de facto expelling him from the Ph.D. program.[4] The district court embraced his de-facto-expulsion theory, agreeing that the Professors' conduct left him no choice but to withdraw from his desired program and settle for a completely different degree.

Babinski's de-facto-expulsion theory is particularly important here because the characterization of his allegations is key to identifying the level of process that he was due. The Supreme Court has drawn a fine line differentiating the process required for students facing discipline actions, as opposed to academic actions which require less procedurally. *Ekmark v. Matthews*, 524 F. App'x 62, 64 (5th Cir. 2013) (per curiam) (unpublished) (quoting *Horowitz*, 435 U.S. at 86). If a student faces certain disciplinary consequences, due process requires an "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence . . . and an opportunity to present his side of the story." *Goss*, 419 U.S. at 581. Applying

---

[4] Other courts have recognized a de facto expulsion as a penalty subject to review under the due process standard. *See e.g.*, *G.C. v. Owensboro Pub. Sch.*, 711 F.3d 623, 631 (6th Cir. 2013) ("[T]he concept of de facto expulsions is not new to this court.") (citing cases).

this standard, the Supreme Court in *Goss* determined that a school's suspension of multiple disruptive students without notice and a hearing was a violation of the students' due process rights. *Id*. at 579.

In *Horowitz*, the Court distinguished *Goss*, holding that "there are distinct differences between decisions to suspend or dismiss a student for disciplinary purposes and similar actions taken for academic reasons which may call for hearings in connection with the former but not the latter." 435 U.S. at 87, 88–89. The student in *Horowitz* sought to challenge her dismissal from medical school after several academic deficiencies, though she was informed of her impending risk of dismissal and the school's dissatisfaction with her performance. *Id*. at 80–82. The Court rejected her claim reasoning that an academic decision is "by its nature more subjective and evaluative than the typical factual questions presented in the average disciplinary decision." *Id*. at 89–90. Leaving the contours undefined, the *Horowitz* Court determined that academic deficiencies require "far less stringent procedural requirements." *Id*. at 86; *see also Davis v. Mann*, 882 F.2d 967, 975 (5th Cir. 1989) (explaining that a student subject to an academic dismissal is entitled to "some meaningful notice and an opportunity to respond").

Traditionally, a student's procedural due process claim falls within one of two arenas—academic deficiencies or disciplinary misconduct. *See Horowitz*, 435 U.S. at 87. The unique factual scenario here does not fit squarely into either category. In his complaint, Babinski alleges that his de facto expulsion is more tantamount to a disciplinary decision, and the district court construed his claims as such. To be sure, the chain of events certainly begins with an academic exercise, including his completion of a paper, obtaining a grade, and disputing the grade. His federal lawsuit, however, does not challenge or focus on the grade he received, nor does he allege that it was the crux of his de facto expulsion. He instead pleads that his de facto expulsion derives from the views that he expressed in his paper. Specifically,

he takes issue with the Professors' conduct in response to his paper, such as their actions *after* issuing his failing grade that effectively froze him out of his chosen discipline. These actions include the secret meeting at which they refused to teach him in the theatre program and their individual and collective efforts to intentionally withhold information from him to ensure his departure from the program.

Given these facts and accepting Babinski's de facto expulsion allegations as true, as we must at this stage, we assume, without deciding, that Babinski has pleaded a violation of the Fourteenth Amendment due process protections. *See Brown*, 519 F.3d at 236 (explaining that we view well-pleaded facts "in the light most favorable to the plaintiff"). But our inquiry does not end here. To defeat qualified immunity, Babinski must satisfy the clearly established prong of the analysis. *See Mullenix*, 577 U.S. at 11 (requiring a plaintiff to also establish that the injury to his constitutional right was "sufficiently clear that every reasonable official would have understood that what he [was] doing violate[d] that right"). As we will explain, he fails to satisfy his burden by misconstruing caselaw at too high a level of generality. *See Bond*, 142 S. Ct. at 11.

### B.     Clearly Established Law

As we previously observed, the district court reached this part of the qualified immunity analysis after holding that the Professors violated Babinski's constitutional rights by de facto expelling him from the LSU theatre program. It then held that the Supreme Court's decision in *Goss* and this court's in *Plummer* clearly established the Professors' conduct as violative of his Fourteenth Amendment right to due process. Assuming arguendo that Babinski's de facto expulsion from a university academic program was a constitutional violation, we disagree with the district court's analysis of the governing caselaw under the clearly established prong.

In *Goss*, the Supreme Court considered a district court's determination that an Ohio law allowing the suspension of students without a hearing in a reasonable timeframe violated the students' procedural due process rights. *See* 419 U.S. at 565–67. While the Court acknowledged the importance of allowing public schools deference in running the day-to-day affairs, it still held that:

> Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. The Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school.

*Id.* at 581. Ultimately, the Court cabined its decision to suspensions not exceeding ten days but explained that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *Id.* Importantly, it never considered whether the public-school official's actions tainted or undermined any process that the students received. Instead, its primary consideration was whether the students were entitled to any process *at all*, and if so, to what degree.

In *Plummer*, two expelled students brought procedural due process and Title IX claims against the University of Houston ("UH"), alleging that the disciplinary proceedings that they were subjected to were constitutionally deficient. *See* 860 F.3d at 767. The district court granted summary judgment to UH and a panel of this court affirmed. We first explained that our role in university-student disputes is not to "second-guess[]" the university's

disciplinary determinations. *Id.* at 772–73 (quoting *Wood v. Strickland*, 420 U.S. 308, 326 (1975)). Rather, our duty is merely to ensure "the presence of fundamentally fair procedures to determine whether the misconduct ha[d] occurred." *Id.* (quoting *Goss*, 419 U.S. at 574). Accordingly, we noted that "[w]hether a state university has provided an individual student sufficient process is a fact-intensive inquiry and the procedures required to satisfy due process will necessarily vary depending on the particular circumstances of each case." *Id.* at 777.

While we considered the students' allegations that the process they received was riddled with a UH official's bias, we never explored any conspiracy by UH officials against the students. *See id.* at 776–77 (rejecting Plaintiffs' argument that a biased official's actions prevented them from cross-examining a witness in their expulsion proceedings). Nor did the students ever allege that such a conspiracy occurred. We ultimately concluded that the students received due process and that their constitutional rights remained intact. *Id.* Notably, that determination effectively ended our qualified immunity inquiry. *Id.* Only a forced interpretation of *Plummer* would allow us to hold that it established anything that happened in Babinski's pleadings.

Both *Goss* and *Plummer* solidify that students, like Babinski, have a Fourteenth Amendment right to some degree of procedural due process before or shortly after university officials take certain adverse actions against them. *See* 419 U.S. at 581 ("Students facing temporary suspension have interests qualifying for protection of the Due Process Clause."); 860 F.3d at 773 (explaining that students are entitled to a "fundamentally fair" disciplinary process). However, neither case involved, alleged, or even mentioned an underlying conspiracy to block a student from enjoying that right. Additionally, neither case dealt with the alleged tainting of the process that a school or university provided to a student. True, qualified immunity

does not require precedential exactitude or a case "*directly*" on point. *Walsh*, 975 F.3d at 485 (emphasis in original). But both of Babinski's proffered cases miss the mark by failing to address conduct like the Professors' in this case. Absent an appropriately analogous case of greater specificity, we cannot uphold the district court's denial of qualified immunity. *See Bond*, 142 S. Ct. at 11.

Fifth Circuit precedent also forecloses Babinski's argument that the mere existence of his right to due process provides fair warning to the Professors for all conduct that he alleges might violate that right. *See Walsh*, 975 F.3d at 487. In *Walsh*, a professor brought a 42 U.S.C. § 1983 suit against the university in which he taught, alleging that it fired him without adequate due process for his alleged sexual harassment of a student. *Id.* at 478. The district court denied the university and its officials qualified immunity. *Id.* A panel of this court reversed, explaining that "the '*sine qua non* of the clearly-established inquiry is "fair warning."'" *Id.* at 486 (quoting *Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011) (en banc)). The panel continued that while it is "clearly established that due process for a terminated professor includes 'a meaningful opportunity to be heard in his own defense,'" there was no caselaw speaking "directly to the procedures necessary to protect a professor's interest in avoiding career-destruction after being accused of sexual harassment." *Id.*

The same is true here. Babinski is asking us to do precisely what the *Walsh* panel refused to do: hold that his right to a meaningful opportunity to be heard put the Professors on notice that their conduct in this case was unconstitutional. *Id.* at 487 ("Nor can we hold, as Walsh contends, that a meaningful opportunity to be heard should have put Defendants on notice that their actions were unlawful." (internal quotation omitted)). Babinski's argument gains no more traction here than Walsh's did there for precisely the same reason: he cannot point to any controlling caselaw that would have

put the Professors on notice that his due process rights were violated in a similar procedural context. In other words, against the Rule 12(b)(6) backdrop, Babinski concedes that he was never expressly expelled from the university. His pleadings likewise acknowledge that, after he alleges that he was de facto expelled, he continued to enroll in courses and ultimately obtained his degree from the university. But we have no caselaw "that speaks directly to the procedures necessary" to protect a student who claims he was de facto expelled from a university, yet continued to enroll in classes and receive a degree from the same university *after* the point in time that he alleges he was de facto expelled. *Id.* at 486. As the *Walsh* panel explained, the clearly established standard requires more than that—there must be a "high degree of specificity" between the alleged misconduct and the caselaw purporting to clearly establish the violation. *Id.* at 487. Without it, the requisite "fair warning" required under the clearly established inquiry is absent. *Id.* at 486.

For these reasons, we hold that the Professors lacked adequate notice that their conduct was violative of Babinski's constitutional rights and because they did not have this notice, they are entitled to qualified immunity.[5] *See Hope*, 536 U.S. at 739.

## IV.   Conclusion

For the foregoing reasons, we REVERSE the district court's denial of qualified immunity and DISMISS Babinski's claims against the Professors.

---

[5] Both parties make competing arguments on whether the Professors could pursue their qualified immunity argument at a subsequent stage of litigation proceedings. We do not address those concerns due to our holding herein.