# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-10857

United States Court of Appeals
Fifth Circuit

**FILED**

September 10, 2019

Lyle W. Cayce
Clerk

WAYNE M. KLOCKE, Independent Administrator of the Estate of Thomas Klocke,

> Plaintiff - Appellant

v.

THE UNIVERSITY OF TEXAS AT ARLINGTON,

> Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before OWEN, SOUTHWICK, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

This appeal arises out of a Title IX suit for damages alleging that the University of Texas at Arlington ("UTA") discriminated on the basis of sex in disciplining student Thomas Klocke. The district court granted summary judgment to UTA. We affirm.

I.

In May 2016, Thomas Klocke and Nicholas Watson were enrolled in an accelerated two-week summer class at UTA. On Thursday, May 19, Watson reported to UTA administrators that he felt threatened by Klocke and would not return to class if Klocke were present. Watson gave the following account.

No. 18-10857

Watson and Klocke were sitting next to each other in class when Klocke typed "gays should die" on his computer and showed it to Watson. Watson typed back, "I'm gay." Klocke verbally called Watson a "faggot." Watson told Klocke, "I think you should leave." Klocke replied, "You should consider killing yourself." Klocke changed seats about an hour later.

Dean of Students Heather Snow referred the matter to Student Conduct Officer Dan Moore. On May 19, Moore emailed Klocke to inform him that Moore was investigating whether Klocke had violated UTA's Student Code of Conduct. Moore barred Klocke from attending or contacting anyone in the class pending further notice. Klocke responded to Moore denying that he had violated UTA policy, requesting further information, and asking to be allowed to attend class. On Friday, May 20, Moore and Klocke spoke by phone. Over the phone, Klocke did not provide a counter-narrative or otherwise dispute the allegations.

Moore met in person with Watson on Friday, May 20. Moore thought that Watson came across as "genuinely scared and worried" and "fearful of Klocke." Watson mentioned that shortly after the confrontation, while class was still in session, Watson had emailed the professor Dwight Long and passed a note to his adjacent classmate. Moore later confirmed that Watson had relayed the same version of events to both Long and the classmate.

Moore then met in person with Klocke on Monday, May 23. Klocke denied making homophobic comments. According to Klocke, Watson had flirtatiously called Klocke "beautiful," and Klocke responded by typing, "Stop–I'm straight." Watson continued glancing over at Klocke until Klocke told him a second time to stop. Klocke agreed that Watson had told him to leave. He explained that he later changed seats because Watson was creating a distraction by laughing and using his phone.

2

No. 18-10857

Throughout the May 23 conversation, Moore noticed that Klocke continually referred to a piece of paper that "appeared to be a script or outline." When Moore asked Klocke follow-up questions, he observed that Klocke "would consult his script/outline and there were often long pauses before he would say anything." Klocke's responses, when he gave them, seemed to Moore to "lack[] any substance." For instance, Moore recalled that "at one point Klocke said that he was scared of his accuser. [Moore] asked why he was scared, and he wasn't able to tell me why. He just said he was scared."

At the end of their conversation, Moore told Klocke that Klocke could work with classmates on a group project but that Klocke would remain barred from attending class. Moore also arranged for Klocke to take an upcoming May 24 exam in a separate space.

On Tuesday, May 24, Moore interviewed the classmate who had been sitting closest to Watson and Klocke. The classmate had not overheard the conversation and had only noticed that "both students looked really tense." Contrary to Klocke's version of events, the classmate had not noticed Watson laughing or otherwise causing a distraction. After Klocke left, the classmate had asked Watson what happened, and Watson had passed over a note saying, "That guy called me a faggot, told me gays should die and [illegible] I should kill myself. am [sic] actually scared."

Based on these interviews, Moore found Watson "more believable" and concluded Klocke should be held responsible for harassment, but not for making threats. Because Watson was "still very uncomfortable" with being in class with Klocke, Moore hoped to find a solution where Klocke could finish the course without attending. Moore contacted Long, who assured Moore that he could work one-on-one with Klocke outside of class and adjust Klocke's assignments as needed.

3

No. 18-10857

On Wednesday, May 25, Moore and Klocke had a final meeting. Moore explained that he had concluded his investigation and was holding Klocke responsible for harassment. Klocke would be placed on disciplinary probation and would not be allowed to attend class, though he would be able to complete the course with Long's support. He and Watson would be mutually prohibited from contacting each other. The sanction would appear on Klocke's disciplinary record but not on his transcript. Klocke would have two weeks to appeal the sanction. When Klocke expressed concern that Watson might "look up where he live[d]," Moore told Klocke to contact Moore if he felt he was being harassed or stalked.

For the next week, Klocke continued to do coursework, albeit without attending class. He completed portions of the five-part, self-paced final exam, worked on a group project with classmates, and met one-on-one with Long.

On the evening of June 2, 2016, Klocke killed himself by shooting himself with a gun he had purchased on May 20.

II.

In April 2017, Wayne Klocke as administrator of Klocke's estate filed suit against UTA.[1] The estate alleged that UTA's disciplinary actions were motivated by gender bias, in that, for instance, UTA pre-judged Klocke guilty of harassment based on his gender and sexual orientation. The estate sought damages for Klocke's "suffering and anguish prior to his death."

In April 2018, UTA moved for summary judgment. The district court granted the motion, concluding that the estate had failed to identify any evidence supporting an inference of intentional discrimination necessary to

---

[1] The estate also filed a defamation claim against Watson, which is not at issue in this appeal. *See Klocke v. Watson*, No. 17-11320, 2019 WL 3977545, at *1 (5th Cir. Aug. 23, 2019).

No. 18-10857

sustain a private Title IX claim for damages. The district court entered final judgment in favor of UTA, and the estate timely filed a notice of appeal.

III.

We review de novo the district court's grant of summary judgment. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "When the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *McClendon v. United States*, 892 F.3d 775, 781 (5th Cir. 2018) (quotation omitted). "All reasonable inferences must be viewed in the light most favorable to the party opposing summary judgment, and any doubt must be resolved in favor of the non-moving party." *Id.* (quotation omitted). "A non-movant will not avoid summary judgment by presenting speculation, improbable inferences, or unsubstantiated assertions." *Lawrence v. Fed. Home Loan Mortg. Corp.*, 808 F.3d 670, 673 (5th Cir. 2015) (quotation omitted).

Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[2] 20 U.S.C. § 1681(a). Title IX is "enforceable through an

---

[2] As a threshold matter, UTA argues that Klocke, as a matter of law, was never deprived of an educational opportunity or benefit under Title IX. We reject that view. A student barred from attending class is literally "excluded from participation in" an "education program." 20 U.S.C. § 1681. Here, it is undisputed that Klocke was not allowed to attend 9 out of 11 class sessions. The record does not indicate that class recordings were ever made available or even offered to Klocke. The record does show that although Long offered to meet Klocke one-on-one to discuss class material, Long had limited availability over the short summer intercession period. These facts indicate that Klocke experienced a "concrete, negative effect" on his "ability to receive an education." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 654 (1999).

5

No. 18-10857

implied private right of action," and "monetary damages are available in the implied private action." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998). A plaintiff may obtain damages under Title IX "where the funding recipient engages in intentional conduct that violates the clear terms of the statute." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 642 (1999). The plaintiff must show that the school's response was "clearly unreasonable in light of the known circumstances." *Id.* at 648. "In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Id.* at 649.

The Supreme Court has "consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005). Thus, a school's "deliberate indifference" to a student's claims of sexual harassment by a classmate may amount to an intentional violation of Title IX. *Davis*, 526 U.S. at 643–46. "[R]etaliation against individuals because they complain of sex discrimination" is also "intentional conduct that violates the clear terms of the statute." *Jackson*, 544 U.S. at 183 (citing *Davis*, 526 U.S. at 642).

The Second Circuit has further observed that "[p]laintiffs attacking a university disciplinary proceeding on grounds of gender bias can be expected to fall generally within two categories." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). Those in the first category argue that the disciplinary proceeding had an "erroneous outcome" and that "gender bias was a motivating

---

UTA cites *Doe v. Valencia College*, 903 F.3d 1220, 1227 (11th Cir. 2018), for the proposition that "unenrolling a student from a class is not a Title IX violation." That is not what the Eleventh Circuit held. Rather, the Eleventh Circuit concluded that a student's Title IX claim failed because there was no genuine issue of fact about the correctness of the challenged disciplinary proceeding.

6

factor behind the erroneous finding." *Id.* Those in the second allege "selective enforcement," i.e., that "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.* Both parties embrace this framework, and on appeal, the estate relies on erroneous outcome, selective enforcement, and retaliation.[3]

A. Erroneous Outcome

A plaintiff alleging an erroneous outcome must point to "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding"—for instance, "a motive to lie on the part of a complainant or witnesses, [or] particularized strengths of the [disciplined student's] defense." *Yusuf*, 35 F.3d at 715. "If no such doubt exists based *on the record before the disciplinary tribunal*, the claim must fail." *Id.* (emphasis added). The plaintiff must also demonstrate a "causal connection between the flawed outcome and gender bias." *Id.*

*i. Erroneous outcome*

The estate argues that Moore's disciplinary decision was based on an "acknowledged lack of evidence." The estate relies on Moore's statements in May 24 emails to Snow that (1) the adjacent classmate "just heard the same line, 'I think you should leave' but nothing else. I'm not sure I have enough here to keep [Klocke] out of class"; and (2) "Bottom line is both are giving very different accounts. I find [Watson's] account more believable, but I do not have anything to corroborate it."

Viewed in the light most favorable to the estate, Moore's May 24 statements do express reservations about finding Klocke responsible and

---

[3] The estate's opening brief did not discuss its theories of deliberate indifference or archaic assumptions. Those arguments are waived. *See, e.g., Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004).

further restricting him from class. But the statements are insufficient to raise a triable issue as to erroneous outcome, because it is uncontradicted that Moore considered the following in his decision.[4] First, Moore knew that Watson told the same, consistent story in a contemporaneous in-class email to Long, also a contemporaneous note passed to a classmate, and then again in after-class emails and in-person discussions with Long, Snow, and Moore. Second, Moore perceived Watson to be credibly fearful of Klocke at their May 20 meeting.[5] Third, when Moore met Klocke on May 23, he saw that Klocke relied on a written script and was unable to meaningfully answer follow-up questions. Fourth, Moore was told by the adjacent classmate that the classmate did not notice Watson behaving in a distracting manner as Klocke had alleged.[6] Fifth, Moore's common sense suggested to him that a person whose flirtation is rejected would not tell the other person to leave and then fabricate and widely circulate a story about being threatened by that person. Sixth, Moore's investigation uncovered nothing supportive of Klocke's account, and the estate

[4] The estate makes a sweeping attack on Moore's litigation declaration for providing "after-the-fact explanations about what [he] supposedly felt or understood." But the estate does not identify any material contradictions or inconsistencies in Moore's sworn statements. The estate cannot avoid summary judgment by making speculative attacks on Moore's credibility. *Lawrence*, 808 F.3d at 673. Rule 56(d) allows a nonmovant to show that "it cannot present facts essential to justify its opposition," and a district court may then allow the nonmovant "time to obtain affidavits or declarations or to take discovery," however, the estate did not seek additional time to obtain further discovery. Fed. R. Civ. P. 56(d). Instead, the day after UTA filed its motion for summary judgment, the estate filed its own motion for partial summary judgment on Title IX liability.

[5] Long and Moore also found Watson to be credible. Long, for instance, noticed that after the incident, Watson was "pacing and trying to get my attention," and "sensed that whatever [Watson] had to say was urgent" due to his "large eyes and stiff body language." Snow also recalled that Watson "appeared visibly upset, nervous, and shaken" and was "talking fast.".

[6] The estate attacks this evidence as hearsay, since the classmate did not himself submit a declaration to support UTA's summary judgment motion. But Moore's recollection of the classmate's statement was not offered to prove the truth of the matter asserted. Rather, the statement was offered as proof of Moore's due diligence before concluding that Klocke was responsible for harassment.

in this litigation does not identify any leads that Moore should have or could have pursued. These facts show, contrary to the estate's interpretation of Moore's May 24 statements, that Moore made a finding of responsibility after developing a meaningful record.

*ii. Gender bias motivating erroneous outcome*

Even if Moore erred in finding Klocke responsible for harassment, the estate has not identified evidence that that gender bias affected Moore's investigation and conclusion. The estate argues that gender bias can be inferred because Watson, who is gay, received preferential treatment over Klocke, who was straight. We need not resolve whether under Title IX, discrimination on the basis of sexual orientation counts as discrimination on the basis of sex, because no such bias can be inferred. *See Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 330 (5th Cir. 2019) (affirming grant of summary judgment to employer based on transgender employee's failure to establish a prima facie case of discrimination under Title VII).

First, UTA had reasonable and non-discriminatory reasons to exclude Klocke, rather than Watson, from class. *See Davis*, 526 U.S. at 649 (conduct in Title IX suit for damages must be "clearly unreasonable"). Klocke's alleged conduct was derogatory and physically threatening; Watson's alleged conduct was not, even if it made Klocke uncomfortable.

The same goes for Moore's decision to not initiate misconduct proceedings against Watson. The estate suggests that Watson sexually harassed Klocke by making "unwelcome sexual advances," but per UTA policy, conduct "intentionally directed towards a specific individual" is not considered sexual harassment unless it "unreasonably interfer[es] with that individual's education . . . or participation in University activities, or creat[es] an intimidating, hostile, or offensive environment." Moore reasonably concluded

that a single comment that someone was "beautiful," accompanied by glancing, would not amount to sexual harassment.

Finally, the estate takes issue with Moore's decision to treat Watson's allegations as allegations of harassment, rather than sexual harassment. According to the estate, by declining to investigate Klocke for sexual harassment, UTA deprived Klocke of valuable procedural protections such as a hearing before a neutral decisionmaker. This is not persuasive, because Moore reasonably concluded that Watson alleged only harassment. Insults like "faggot" and comments like "gays should die" squarely fit within UTA's definition of harassment, defined in relevant part as "hostile or offensive speech" such as "threats, insults, epithets, ridicule, [or] personal attacks" "often based on the victim's appearance, personal characteristics or group membership." UTA defined sexual harassment as "[u]nwelcome conduct of a sexual nature," and it defined verbal sexual harassment to include "propositions to engage in sexual activity," "gratuitous comments . . . of a sexual nature about clothing or bodies," "gratuitous remarks about sexual activities," "persistent, unwanted sexual or romantic attention," "subtle or overt pressure for sexual favors," "exposure to sexually suggestive visual displays," or "deliberate, repeated humiliation or intimidation based upon sex." It was reasonable for Moore to decide that sexual harassment was not at issue, in part because most of UTA's examples focused on conduct that was explicitly romantic or sexually suggestive.[7]

---

[7] The estate makes much of Snow's pre-suit deposition statement that Klocke's alleged comments constituted "sexual harassment" as defined in the Department of Education's 2011 "Dear Colleague" Letter. *See* United States Department of Education, Office of the Assistant Secretary for Civil Rights, Dear Colleague Letter, (2011), available at http://www2.ed.gov/print/about/offices/list/ocr/letters/colleague-201104.html. Snow's deposition statement has little bearing on whether Moore reasonably declined to investigate Klocke for sexual harassment under UTA policy. First, the "Dear Colleague" letter's definition of sexual harassment is not identical to UTA's definition. The estate never

No. 18-10857

In sum, UTA's disciplinary decisions were reasonable and justifiable on non-discriminatory grounds. An inference of gender bias in these circumstances would necessarily be speculative.[8]

B. Selective Enforcement

A selective enforcement claim needs to allege that either punishment or the decision to initiate enforcement proceedings was motivated by gender bias. In support of a selective enforcement claim, the estate has identified nine female students who were investigated for misconduct but not prohibited from attending a class, either on an interim or a permanent basis. Considering these cases in the light most favorable to the estate, none permits the inference that similarly situated female students were treated more favorably than Klocke. *See Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 345 (5th Cir. 2005) (affirming grant of summary judgment in Title VII case based on failure to identify sufficiently similar comparators). In seven cases, nothing indicated that the complainant shared a class with the accused. For one of the remaining two cases, UTA's investigation began after the shared class had already concluded. In the last case, the accused student called her professor a "bitch," and when the professor asked UTA to investigate, the professor had already barred the accused from returning to class.

---

discusses the overlap between the two definitions—in fact, the estate does not refer to the "Dear Colleague" letter anywhere in its briefs. Second, the estate does not dispute that under UTA policy, it is not Snow's job to assess what charges should be brought, nor did Snow offer such an assessment to Moore here. Snow left Moore free to conduct his own investigation, and Moore independently concluded that the allegations were potentially threats or harassment, but not sexual harassment under UTA policy.

[8] Relatedly, in the Title VII context, once a defendant provides a "legitimate, nondiscriminatory reason for its decision," the burden shifts to the plaintiff to show that the reason is pretextual. *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1087 (5th Cir. 1994). Our court has not yet settled whether Title VII frameworks of proof are directly applicable to Title IX claims of gender bias. *See Arceneaux v. Assumption Par. Sch. Bd.*, 733 F. App'x 175, 178–79 (5th Cir. 2018).

No. 18-10857

Significantly, the estate does not dispute UTA's statistics about the rate at which UTA holds men and women responsible for threat or harassment. Those statistics do not show disparities between accused men and women. In the three years preceding Klocke's and Watson's confrontation, UTA investigated 32 harassment complaints, 7 against women and 25 against men. 5 out of 7 women were found responsible (71%) and 15 out of 25 men were found responsible (60%). UTA also investigated 17 threat complaints, 5 against women and 12 against men. 3 out of 5 women were found responsible (60%) and 8 out of 12 men (67%) were found responsible. As to Moore himself, Moore had previously investigated 24 students, 12 men and 12 women, for non-academic offenses. He found 9 out of 12 women responsible (75%) and 10 out of 12 men responsible (83%). Nothing about this data suggests systemic gender bias; indeed, men and women at UTA are found responsible for threat or harassment at remarkably similar rates.

C. Retaliation

The estate argues that UTA held Klocke responsible for harassment in retaliation for Klocke's allegation that he was sexually harassed by Watson. However, the estate cites no additional evidence to support a retaliation claim, beyond the evidence already discussed above.

IV.

For the foregoing reasons, the district court's judgment is AFFIRMED.